For the day, Air Ranch v. Heartbrand Beef, are both sides from Houston? Yes, Your Honor. Just had to walk here. I hope you appreciate our arranging this for you for the New Orleans. We're very grateful. Mr. Zucker? Probably feel deprived of their cup of gum, though. Convenience isn't everything, I don't know. May it please the Court, my name is Jim Zucker, and I'm here on behalf of Bear Ranch in this appeal. Of course, I'm happy to address any questions regarding any of the issues raised in the party's briefing, but I'd like to focus— Okay, I'm glad about that, because I actually—usually we say, don't tell us the facts, we already know the facts, and I know the facts as you all have explained them, but what I don't understand is, what was the point of all of this? I mean, you entered into a contract to buy these Akashi cattle, but you can't sell them as Akashi cattle, except back to Heartbrand, I guess. So, had this gone well, this relationship, what was supposed to happen? Your Honor, from Bear Ranch's perspective, they were going to have beef that they could consume for their own benefit, but also a high-end niche beef program where they would sell beef not marketed as Akaushi, but simply marketed as, you know, what they call 7X beef today, or red wagyu. They were prohibited from using the term Akaushi, but they were not prohibited from selling beef absent that label. Okay, so then how is Heartbrand harmed? I mean, I'll ask them, too. I know you're the opposing power, but I just—I'm just— I had a torts professor who would say, what really happened here when we would read these facts? It didn't make any sense. And I have that question here, because it seems like a lot of money, a lot of time, and all of that has been spent to end up with the result that I guess your opponent doesn't like, at least the non-monetary part of it, and you don't like the monetary part of it. And I don't understand why it hasn't been resolved and why we have this situation where you couldn't market this cattle as Akaushi or however you pronounce it. Anyway, regardless of who you bought it from and you agree to that and the court so found and you're not appealing that, I don't know. I just find it hard—I know the legal issues you all have raised. I know the briefing points you've made on that. I'm just having trouble really understanding the context of this. Your Honor, I think that where we've ended up, you aptly described as we don't like the monetary parts of it and they don't like the non-monetary parts of it. I think we've ended up essentially where we thought we should end up, and that is we have the Beeman herd as an unrestricted herd that we can sell into the market or slaughter and sell as beef. As the Japanese—you can sell to Beeman now? So there are three sales at issue in the case. There was the Hartbrand herd in 2010, the Beeman herd in 2011, and then a combination of Twinwood and Spears herd subsequent to that. And all three herds are made up of full-blood Akaushi Japanese cattle. Well, where is—what was the fraud, what was the liability of your client for selling to Beeman? There was no contract between the two.  I mean no restrictive cover. And that basis for liability was because of the contract that they made with Hartland in selling to Beeman without any restriction. Their argument— I'm just asking. So the court found as a matter of law that there was no contract that governed the sale from Mr. Beeman to my client Bear Ranch. So once the court made that finding on summary judgment, Hartbrand changed its argument to an extent and claimed, well, there was fraudulent inducement. There was fraud in that Bear Ranch represented that it would abide by the terms of the 2010 contract with respect to the Beeman herd. And that's what the jury entered the fraud finding on that then resulted in the exemplary damage award that we opposed. Oh, it wasn't cattle that your client sold to Beeman. It was cattle that they bought from Beeman. Yes, Your Honor. And they applied the contractual arrangement between you and Hartland. Hartbrand and Mr. Beeman, their contention was that the contract, the 2010 contract, applied to that purchase from Mr. Beeman. And that's what the trial court found on summary judgment, that that contract did not apply to the purchase from Mr. Beeman, which is why Hartbrand then asserted their fraud claim in lieu of the contract. And that sort of backdoored to the same place, right, because that's the effect of the injunction. Now, you said they don't like, I mean, everybody seems to agree that they don't like the injunction, although, of course, I'll give them a chance to answer that. So what is happening now? So today Hartbrand has disclaimed all the relief it obtained in the court. So then what can you do with the Beeman cattle today? If this judgment were affirmed as is, what could you do with the Beeman cattle? We are free to sell the cattle, sell the genetics on the open market. But not as Akaushi, but just as special doodly-do. We still cannot market them as Akaushi, but we would be able to sell them without contract restrictions so that the subsequent purchaser presumably could market them as Akaushi or do whatever they want with them. How would they know they're Akaushi if you're not allowed to say it? I think it's well known in the industry that red wagyu are the equivalent of Akaushi. So you would market it as red wagyu and sell it to someone else, or you could have a hamburger party at your ranch, and all of that would be okay consistent with the injunction because they don't want to buy back the cattle from the Beeman sale. Yes, Your Honor. The only qualification is that if we sold the cattle into the open market without restriction, any price above the $3,900 constructive trust, those dollars would go to Hartbrand. The $3,900 would stay with us. Would stay with you. Okay, so that's the effect going forward. And I was intrigued by your argument that we may or may not have to decide this exemplary damages based on equitable remedies where the equitable remedy has value if we say here the equitable remedy prevented the harm so that there wasn't a damage. I could see the argument being, you know, the damage is you took my car, and when you have to give the car back, that does have value. Even if you didn't hand me dollars, you handed me a car, and therefore that is damages because the car has value. But if here you're saying the anticipatory harm never happened because of the injunction and therefore there isn't really a return of a car, so to speak, then there is no damage equivalent to latch onto with the Chapter 41. I think that's right, Your Honor. Is that the argument? That's one aspect of the argument. I think the initial aspect is that Chapter 41 requires a finding of economic damages. Yeah, but the problem that you have there, first of all, you have the fact that there can be non-economic in the $200,000, and then you have the problem that this is a very weird, weird jury charge. And granted, I have a lot more experience as a district judge. I would have zero experience as a district judge, federal district judge, doing jury charges. But I've done a lot of state jury charges. But either way, I mean, this notion that there should have had to be a dollar, that seems like an objection you should have made to the charge. So I think it's important to put that charge in context. At the outset of the trial, or before the trial began, Hart Brand submitted a proposed jury charge that included questions for damages related to the fraud claim with respect to the Beeman herd. During the course and going into the trial, their expert had offered an opinion calculating lost profits due to this alleged fraud regarding the Beeman herd. So they went into the case proposing to ask a question for damages, and they went in with a damage calculation. Granted, it was about $440,000. During the course of the trial, they elected not to put that evidence before the jury. So their expert never testified to it. The morning before their expert testified, they confirmed to the trial court that they were seeking an equitable remedy of unjust enrichment of $90 million. Then before the jury charge, the judge again confirmed with them that they were seeking an unjust enrichment, a purely equitable remedy at that point. So then the question is, do we have an obligation to object and insist that, one, they put evidence into the record of damages, or two, that the effect of their strategic decision not to put that evidence before the jury and not to put that question to the jury, do we have an obligation to object to that and explain to them the implications of that strategy? We don't think we do. We think that is a choice they had to make, and we think that if they had wanted to put that question to the jury, at that point they wouldn't have been able to because they had not elicited the testimony from their expert that there were lost damages. But you're—and I understand that argument. I guess what I'm saying is, do we even have to— this sounds like a fairly, you know, involved question of Texas law, which we as a federal court certainly are competent to do, but we try not to run around making new law for Texas if we can help it, as exciting as that may be. And so aren't we able to, if we embraced your other argument, get to the same place, which is we weren't unjustly enriched because we were prevented from being unjustly enriched by the injunction? Yes, Your Honor, I think that's correct, that the exercise that the trial court undertook in crafting the equitable remedy with respect to the Beeman herd was to prevent injury. And so he did that by giving Hartbrand the opportunity to buy back those cattle, and they disclaimed that opportunity. So today we hold those cattle without restriction, but that's due to the choice that they made. And so had instead the district judge awarded $90 million in unjust enrichment, then there would have been at least an argument that there's damages to tack onto. I know you still would have said the equitable relief, but then we would have to decide does the phrase equitable relief knock out Chapter 41 altogether, even if there's a $90 million judgment, which I think is a higher hurdle to me to say, well, $90 million isn't really money. It's kind of equitable. I do think it's significant that that $90 million represents what Bear Ranch, and the jury ultimately gave an advisory verdict of $23 million. Once we're in the millions, if we count those, you're done with your exemplary damages because that's going to be enough to support, because you have the one-to-one, if we count the millions at all, right? So I guess we would say that under Chapter 41, the cap in Section 41.008 says the greater of economic damages, twice economic damages, or $200,000. And that economic damages is defined in Chapter 41 as compensatory damages intended to compensate the claimant for pecuniary loss. So even the $23 million is not evidence of their pecuniary loss. But then it would be the $200,000 cap. I think what I'd like to leave here at the end of my time is to point the court to Walmart versus Forte. And obviously that's where the Texas Supreme Court answered the two certified questions from this court regarding application of Chapter 41.008. And significantly, I think those are the same two questions that are at issue here. Does Chapter 41.008 apply, or is there an exception? There it was an exception for the Texas Optometry Act and civil penalties. Here it's an exception for the common law. And what the Texas Supreme Court held was that Chapter 41.008 is the public policy of Texas, and it applies to any action for damages, even if it's an action just for exemplary damages. So I think there's no doubt that it applies in this instance. Then the question is, is there an exception to Section 41.004's legal bar to recovering exemplary damages without a finding of damages other than nominal damages? There's nothing in the text that suggests an exception. That's what the court in Walmart versus Forte looked to, and it said the purpose of the statute is to restrict and structure recovery of exemplary damages in Texas, and so we're not going to read an exception that isn't already in the text. And I think the Texas Supreme Court would reach the same conclusion here. I wanted to ask you very quickly about attorney's fees. If we assume arguendo that we would affirm the determination on the breach of contract, which would give rise to the attorney's fees, and that attorney's fees is a matter of discretion for the court given these various factors, what is the problem? Because they did require segregation. So is the problem that they lost on a bunch of contract claims too, and so you shouldn't give them this much on this one little one that they won? Or what is the real problem with the 3.2? I'm sure they spent it, so that isn't the problem. What's the problem? The issue, Your Honor, is that the relief they received as a result of that doesn't warrant a $3.2 million award of attorney's fees. The results obtained issue. The results obtained. They obtained a return of the cattle, which they then disclaimed and said we don't want the cattle back. And so at the end of the day, they really got nothing. They didn't even seek the $100 annual fee that they said we were supposed to pay but didn't. And so having received no benefit of this suit, we think an award of $3.2 million does not fit with the results obtained. All right. We'll save time for a photo. Good morning, Your Honors. May it please the Court, Jason Powers here for the defendants below, Hart Brand Beef, Mr. Ronald Beeman, and the American Akaushi Association. I'd like to begin on the last point that Mr. Zucker addressed, the attorney's fees. I think Mr. Zucker's description doesn't capture everything that happened here. Judge Costa obviously gave a lot of attention to the attorney's fees issue. There was extensive briefing on it, literally hundreds of pages of support put to the record with respect to it. We had cut back our fees to segregate at the initial step. He ordered us to go back and resegregate in a different fashion. We reduced our request by about 25 percent at that point, went through an additional round of briefing. What was your actual total bill, if you will? If I recall, it was on the order of $5 million, Your Honor. Okay. This is still a pretty high percentage of it for losing a good bit of the contract claims. Your Honor, I think the issue was that all of the cases that Bear Ranch describes here on what is the measure of success, all these cases are cases in which the plaintiff, in a civil rights act case primarily, is held to the standard of have they changed the relationship between the parties or have they gotten some of the benefit that was sought. What benefit was sought on the contractual claims? The important thing to remember below is that we were the defendants. We did not bring this action. We've got a contractual remedy that says that if we are to enforce the contract, that we are to get all of our attorney's fees incurred enforcing the contract. When Bear Ranch started this fight, their purpose was to destroy the contract. They had a variety of different theories to get there. They claimed that the contract violated antitrust law. They claimed it was procured by fraud. They claimed that we'd breached it. They claimed that it didn't apply to offspring. So however they sliced it, there were a lot of different ways in which they were trying to undo the contract. The goal set out by the attorney's fees provision is to enforce the contract, and no matter how Bear Ranch thinks we did on the fraud claims, there is no question that on the issue of preserving the contract, we pitched a shutout. We defeated the antitrust claim. It was abandoned. We defeated the fraud allegations with the jury. The breach allegations never went anywhere. So the contract was preserved, and our rights to keep the herd under control was preserved. But then you've just claimed the only relief you got. I disagree with that, Your Honor. In fact, part of what I think the goal here that Mr. Zucker described, it's not just a matter of getting the cattle. Our goal was to keep the cattle under our control. The goal of this contract, Your Honor, had asked Mr. Zucker about that. The goal of this contract from our perspective was to get a supply of beef that would be available for our system, to involve producers in our program, to accelerate the amount of acreage feed, the ability to produce cattle, and to get them available for us to generate beef. So had everything gone smoothly and you all stayed friends and all that, what was your client's vision of what would happen? Was it that Bear Ranch would develop these cattle and then sell them back to you all, and then you would sell them to restaurants to be listed on the menu as Akaushi? That's correct, Your Honor. So that's where the name would come up? That's right, Your Honor. Our goal was to get to a point where we would have more supply of beef available so that we could put it in stores and on plates to further establish Akaushi as a recognized brand. The goal of preventing them from using the unique name is so that we will have control of that brand and be in a position where we can tell the market we have a special kind of cattle. It's got a special kind of genetic background. It has a wonderful flavor profile. And because we are the ones who have that, we are in a position to exploit that value. Because the contract was preserved, and because the cattle that are under the 2010 contract remain under that contract today, we hope that Bear Ranch at some point will begin to start selling us cattle the way they're supposed to, the way they agreed to in the original contract. But why can't they do it under the injunction of the court? Or is that only on the Beeman? On the Beeman cattle, they have a different set of rules. But on the Hart Brand cattle, under the 2010 contract, they are exactly as we had originally intended. But nothing's happening under that. At this point, Bear Ranch is continuing to withhold cattle from us. But at this point, if they just continue to grow the cattle. We'll decide the legal issues presented to us. But to me, this just really defies logic, that this much effort and attorney's fees have been spent and the business relationship has been zero for anybody. I don't get that. I mean, I was a litigator for many years. And I know you had to also look at, in addition to fulfilling your legal obligations, just the overall good of the client. And I'm just missing that here from both sides. But again, if I were a trial judge in this, and I'm sure the trial judge did, I would push that a little harder. But we'll decide the legal questions. But I'll just throw that out there. Your Honor, I will say that we have shared that frustration from the beginning. The notion that Bear Ranch acquired these cattle for some purpose other than what our program was designed to accomplish, that their witnesses agreed in testimony they understood what the program was designed to accomplish. We have been trying to get them to get on board. And why they continue to fight it, I just don't know. The court had asked about whether the equitable remedy is preventing harm, and let me address that question. The constructive trust that Judge Costa ordered, ordered that reconveyance of those cattle would be available. If we wanted to go get all those cattle, we were entitled to do so. The value of the cattle at the time that conveyance was ordered is established, it's set. Whether Hart Brand chooses to take them or chooses not to take them is something like whether we collect a money judgment or not. The exemplary damages don't depend on whether after the judgment is established we choose to exercise the remedy or take advantage of the remedy. But here's the important part. That injunction did not prevent the unjust enrichment. The unjust enrichment was Mr. Koch and Bear Ranch getting those cattle away from Mr. Beeman and getting them out of the Hart Brand system. He has the asset on his ranch. He is unjustly enriched by the fact that he has that valuable asset on his ranch. Well, I don't know. That valuable asset is eating a lot of hay or whatever, or grass, and they're having to care for them. I mean, it's costing them a lot. It's not like they're sitting around with a nice gold statue they can look at. So I don't know that this is quite accurate. And, again, it seems to me, though, that the court could have agreed with you and awarded some amount of money on unjust enrichment, but instead did not find that to be the case, didn't award $23 million, $90 million, or even $0.05. Instead said, great, you want the cattle back? Here they are. But you do have to pay something for the fact that, and even the jury, which didn't seem to like Bear Ranch, found that they had, in fact, spent money raising this cattle, which is obvious. So I'm still struggling with how they're unjustly enriched by having a bunch of cows eating grass that they can't sell as akushi and that you won't take back, that you're so mad that they got it but you won't take back. And, Your Honor, they actually, as Mr. Zucker said, they have the right to sell them. They can sell them at this point, assuming, and I don't know why they haven't sold them, to be honest. I've been waiting to hear that they've done so. But they have chosen not to at this point. For whatever reason, they have cattle that no one disagrees are valuable cattle. And let me just address that point because you may be wondering why it is that we didn't go and take these cattle when they were offered to us by the court. When we were at trial, Hart Brand was seeking findings that would have allowed us to reacquire all of the And we had sought jury findings on different segments of the cattle, depending on the different remedies that were available to us. But because the court had decided that the 2010 contract was not a framework contract that governed the entire akushi herd, as we believed, we had to do it by way of the fraud allegations. The jury found fraud as to the Beeman cattle, which was the largest segment of them, but did not find it as to the Twinwood and Spears purchases. And that has a really important impact because when we are trying to get the cattle back, we have no remedy that allows us to retain the Twinwood and Spears cattle. So once that's happened, buying the two large segments, the Hart Brand cattle and the Beeman cattle, back at a cost of about $12 million would have been, frankly, a disastrous move. It would have depleted Hart Brand's capital. It would not have allowed us to preserve control over our genetics the way we'd originally intended because the Twinwood and Spears cattle would remain out there. Those Twinwood and Spears cattle were enough. They were enough in number to give Bear Ranch a breeding nucleus of cattle with which they could duplicate our offering and with which they could compete against us. And if we paid them $12 million to get all those cattle that, frankly, we didn't need because we could produce more akushi, we've already got akushi genetics. So we don't need those extra cattle. We'd pay them $12 million, deplete our capital, increase theirs. And sadly, from our perspective, we would not even be able to use those cattle in our meat program. There's a reason for that. Bear Ranch has a different philosophy about how they'd like to produce these cattle. They do not intend for them to be something that would be more palatable to an American consumer. They feed them longer. Because they feed them longer, they become more fatty, and they aren't something that would be usable in our market focus. As a result, we can't use them in our certified program. Our certified program is a USDA-defined program. It's got a very specific age of the cattle that you have to slaughter by. So we can't use their cattle for meat. We can't use their cattle for genetics because we've already got the genetics. And we can't eject them from competing against us using our own genetic store. So as a result of that, we chose not to buy the cattle at that point and just line their pockets. The reality is that as the remedies that have been available to us have shifted over time, sometimes at the summary judgment stage, at the verdict stage, at the court's equitable remedies decisions after verdict, we have tried to take whatever option was available to us and make the best choice that would allow us to preserve as much of our business model as we can within the capital constraints the business faces. And no question, the capital constraints have been aggravated by Mr. Koch's litigation campaign against us, but we have tried consistently to preserve as much of the value of this business and this asset as we can. So that's the reason why we approached that issue that way. The hope from our perspective is that a remand on the constructive trust issue will allow us to make this remedy more effective by bringing that price down to a point where Hartbrand stands a better chance of recovering. And I'll explain a little bit. So neither side wants us to affirm in full. I mean, that would be accurate. If we simply, our opinion was we affirm, period, both sides would be upset. That's right, Your Honor. We would be disappointed. Because you don't like the way the court approached what you perceive as unjust enrichment. That's right, Your Honor. And instead you want the money. Yes, well. A money. We certainly would be happy to take money, Your Honor. In fact, if the court decided that were an easier way to handle it below, we think that would be perfectly fine. Well, how would you, if you're not getting money, how would you rewrite the constructive trust in a different way? The alternative on constructive trust is simply to reduce the number to accord with the evidence. So what happened was Judge Costa set a constructive trust threshold, we've been referring to it as, of $3,796 per head. Any price Bear Ranch realizes from selling an animal below that price, Bear Ranch keeps everything. Above that figure, we would take anything that goes above the threshold. But I don't think it's disputed in any material way that that number is well above the cost that Bear Ranch incurs either actually or reasonably. What was Judge Costa's reasoning? I'm trying to think if I read this in the brief or I read it in his opinion. Tell me what Judge Costa said about why that figure. Judge Costa used that figure by dividing the jury's award on the cost to acquire, produce, and maintain the cattle that were alive in 2014. He took that and he divided it by the number of cattle there were in 2014 and said that number will just apply going forward. The problem with that is that the cattle that were alive in 2014 included some very expensive breeding cattle that had been purchased from Mr. Beeman. Producing cattle is kind of like writing a book. The first copy of the book takes a year of sweat and tears. The second copy takes $2 of paper and ink. That's what's going on with Bear Ranch. They had $5,000 cows and $10,000 bulls that they used to produce these cattle. The calves that hit the ground cost about $600 or $700 to produce. So if Bear Ranch gets to continue producing calves ad infinitum at about $700 and keep the next $3,000 in profit, they can have a very healthy business, they can make lots and lots of money, and we won't ever see a dime. If that number was dropped down to a more realistic number that accorded with the evidence on what production costs actually are, Hart Brand would be in a much better position and would have a chance to participate in whatever revenues Bear Ranch gets by exploiting our genetics. But these are, you're saying, they're not really exploiting the genetics because you're saying you don't like the way they're raising them, they're not allowed to call them akiyoshi. And so I'm back to, I still find this relationship from the start very, very puzzling, which may explain why y'all are all, your clients are paying lawyers instead of working with each other to figure out a business solution. Because from the start, I guess y'all were shifts passing in the night who somehow signed the same contract, because it's just not making sense to me. I think that's an excellent description of it, Your Honor, because we had a very specific vision of the program that was communicated to Bear Ranch, and as we learned in discovery and then proved at trial, they had an entirely different vision of what they were going to do, which makes it very difficult for us to negotiate on a business solution because we're running two different kinds of businesses. But I think that if we can get to a point where our exemplary damages, our attorney's fees are all in place, perhaps the opportunity for negotiation can begin. I mean, there you go. My concern is sending it back to the district court on the constructive trust when the district court is clearly, this wasn't something that like the judge walked in and said, I don't know anything about this case, tell me about it, and made a decision on two minutes and walked out. This judge was immersed in this case forever, stayed on it after he got on our court, et cetera, and so I think he's done the best he can. And I don't know, I mean, we can certainly disagree on some legal principle and reserve that right to do that and reverse them on a legal principle, but the idea that, well, try again, you know, see what you can do, that doesn't leave me very satisfied as a former trial judge, or in this case where it's clear that the trial judge has given his best effort and certainly not blown you all off or ignored the facts or whatever. I understand that completely, Your Honor. In fact, in Judge Costa's final decision on this question, he mentioned that he thought that he could have had another hearing to take more evidence on the cost issues, but he was concerned that the ever-changing nature of a live asset meant that he couldn't do any better. As we proposed to Judge Costa, and I think this is something that if we go back we would be working again, a simple alternative can be advanced. We can maintain the virtues of averaging that Bear Ranch advocates in their papers. We could have one average that applies to those cattle that were alive in 2014, to which that advisory verdict applied, and a separate average that applied to cattle that were born since then. I think we can do this just based on the evidence that is already in the record. We wouldn't need to have more evidence. If the judge wants it, we'd be happy to give it to him. But I think that can be done quickly and easily. What about the cost of caring for the cattle? Because you said producing, which I assume is the calf is born, but then the calf starts eating and needing vets and needing a place to stay. I don't know anything about raising cattle. I'm just assuming all of this. A living entity just is expensive. And so why are you not giving credit for that? You're saying $600 for the calf to be born, but then the calf has to eat and do other things. Absolutely, Your Honor. And that's why the range of evidence that was presented at trial included if cattle were sold at the weaning stage after they leave their mother or at the fed stage after they're fed ready for slaughter. And those figures rose to $1,400 to $2,000. Again, well below the constructive trust threshold. And we could do that as one average or a couple of more atomized averages. Let me ask one other thing. On unjust enrichment, the notion is that the money you're making is unjust. But there's some degree of, in the Beeman sale, as reimagined by you all and found by the jury, there's some notion that they were entitled to enrichment. So you're kind of saying, well, if they get anything, that's unjust. But I'm thinking the unjust is that difference and not just that they may have benefited from raising these cows because they have the time and the effort and all of that, but that they did so unjustly, and that's on that sphere of not agreeing to follow the Akiyushi rules and all that. It's not just benefiting at all, right? If the fraud had not happened, they would not have these cattle at all. So although we don't have a problem with them recovering the cost they have incurred to raise those cattle and keep them, any profit whatsoever, frankly, is allowing them to benefit from their fraud. Yeah, but that's a benefit-of-the-bargain-damages remedy. That's a little bit different from unjust enrichment because, to me, you're just taking out the word unjust and you're saying enrichment. I disagree with that, Your Honor, because the transaction would not have occurred but for the fraud. And so holding the cattle at all, I think, is something that is unjust and violates the law and is remediable, as the restatement provides. But the notion that they would be entitled to some profit, well, they're getting far more than some profit. So even in that context, we would still probably remand. But, I mean, if I shouldn't have this cup and I say, okay, here it is, it's back, except that I've now spent a year paying rent on this cup that I need back, that's essentially what happened here, right? So then if you go, no, I don't want the cup, then I guess, again, I have trouble with the unjust enrichment. A fair point. And I think one of the examples in the restatement on something of this nature is someone who borrows a horse or a bus and goes on a joyride and wrecks it and then says, well, you know, I was unjustly possessing it, so here you go, it's back. And now where does that leave us? That's why we are not in a position to pay for their cattle. But if they are going to continue to develop them and keep them, that's something they shouldn't be making any profit on. And if the result of this is that they don't keep profit and they let those cattle age out and get used in their program and they don't develop them and they don't sell them in competition with us, that's fine with us. That gives us the best remedy that we can get. And it essentially puts us back in the world we would have been, the out-of-pocket world we would have been, which is the transaction never happened. Thank you. That is all we have, I guess, from two of you. Oh, excuse me. I'm getting ahead of myself. Your Honor, I think we're equally as puzzled as to why we're still here because the remedies offered or crafted by the trial court gave Hartbrand what they sought at trial. They wanted the cattle back. You've wrecked the cows, I guess. You've fed them too much. They're all fat and they're not this nice beef that we want to sell. And the evidence that they would cite in the record is we have some cattle that are older. That's the nature of a herd of cattle. They age. But each spring we have a new crop of calves. So for Mr. Powers to say we have no cattle that they could use in their program, I think overlooks the fact that there are hundreds of calves born each spring that they could have bought back or heifers who would have born the cattle that they then could have used in their program. So the short answer is they rejected the one thing they asked for as soon as the jury returned an advisory verdict for $23 million of unjust enrichment. The cattle were suddenly no longer as valuable to them. Well, what do you say? It wasn't just that. It was that the whole closed system had been open because of the Spears, Twinwood, whatever the other herd is. Yes, Your Honor. So that's why Judge Costa issued an injunction with respect to the Twinwood Spears cattle. And he said, if Bear Ranch is able to retain the Twinwood Spears cattle, then that would undermine their buyback of the Beeman cattle. And so I'm going to keep them under an injunction. And he imposed the very contract restrictions on those cattle. But once they disclaimed the fraud remedy and refused to buy back those cattle, now we have thousands of unrestricted Beeman cattle that we can sell into the market. But had they paid and acquired or bought those cattle back, we would have been left with several hundred Akaushi, the Twinwood Spears herd, under the very contract restrictions that they wanted. Instead, they disclaimed the remedy for the fraud and the Beeman cattle. And so now we have thousands of unrestricted with a few hundred that are under this injunction, which is why we've asked that the injunction be vacated. But to address the point about the buyback price, I think that Judge Costa said he did the very best he could. And what he did was he looked to the jury's number, and that jury's number was a compromise between the two parties' numbers. At trial, the Hart Brands expert gave a number of $10 to $11 million to buy back all the cattle. That was the cost to acquire the cattle, raise the cattle, maintain the cattle. Bear Ranch's expert had a number on the order of $15 or $16 million, and the jury picked a number in between those with respect to the Beeman cattle. So we think sending it back after the trial court has said it's done the very best it can and it's split the difference on the evidence before it, we don't think that makes any sense and is not necessary. If we were to infirm in full, what happens going forward? I mean, other than writing a check for whatever the number is, what else happens? So with respect to any Hart Brand cattle, Bear Ranch has to register those cattle with the Akaushi Association and pay, I think it's a $21 annual fee with respect to each cow, and a $100 membership fee each year. With respect to the Beeman cattle, we can slaughter them and use them in our beef business, or we could sell them on the open market and then we just return whatever is paid above the $3,900. And then with the Twinwood Spears cattle, they would, I guess, fall under the same bucket as the Hart Brand cattle. They would be under the contract restrictions because of the court's injunction. In my last few seconds, I guess I would return to this idea that the unjust enrichment, the remedy the court crafted prevented the injury. It said you can have the asset back. The asset is a living asset, a breathing asset. It's not wrecked. You can have some of the asset back. They disclaimed that. But regardless, there's no evidence in the record of any actual economic damages as defined in Chapter 41. And we think that Walmart versus Forte says Chapter 41 would absolutely apply in this case. And there's no exception, but even if there is an exception, the cap would apply. Thank you. All right. I suppose that now we are finished with this case. We're finished with all the arguments before this panel. The court is adjourned.